UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

PRISCELLA DOEGE, and JUANITA )
COTNER, )
 )
    Plaintiffs, )
 )
    v. )          NO. 2:04-CV-107 PS
 )
OHIO MATTRESS COMPANY )
LICENSING AND COMPONENTS )
GROUP d/b/a SEALY MATTRESS )
COMPANY and IUE/CWA )
LOCAL UNION # 84303, )
 )
    Defendants. )

**OPINION AND ORDER**

This matter is before the Court on Defendant Ohio Mattress Licensing and Components

Group's ("Sealy") Motion for Summary Judgment.  [Doc. 48].  The Plaintiffs are both members

of IUE/CWA Local 84303 (the "Union") who were employed at Sealy's mattress manufacturing

plant in Rensselaer, Indiana.  As the exclusive collective bargaining representative for all hourly

employees at Sealy's Rensselaer plan, the Union entered into a collective bargaining agreement

with Sealy that governed the terms of the Plaintiffs' employment (the "CBA").   During the

course of their employment, the Plaintiffs allegedly participated in a work slowdown resulting in

the termination of their employment.

Following their termination, the Plaintiffs sued the Union and Sealy alleging that the

Union breached its duty of fair representation and that Sealy breached the CBA.    The Plaintiffs

moved to voluntarily dismiss their claims against the Union and the Court granted their motion

on April 27, 2005. [Doc. 47].   The matter is now before the Court on Sealy's motion for

summary judgment.  Because we find that the Plaintiffs' claims against Sealy cannot succeed in

the absence of a viable claim against the Union, we now GRANT Sealy's motion.

## I.  BACKGROUND

Plaintiffs Priscella Doege and Juanita Cotner are former employees of Sealy's

manufacturing plant in Rensselaer, Indiana who were terminated for their alleged participation in

a work slow-down.   On June 25, 2003, the Plaintiffs were assigned to work from 6:00 p.m. until

6:00 a.m. (the "D-Shift") in the Foam Encased Department.  The other members of the D-shift

were Pollie Cleveland, April Harris, Lyle Sayers, and John Soloman.[1]  Of this group, Pollie

Cleveland was designated as the "group leader."  Michael Dock was the Night Shift Supervisor

on duty.

At the beginning of the shift, Dock announced that Doege, Cleveland, and Harris would

be reassigned to the labor pool.  This reassignment meant that rather than working on the

production line, they would be used as needed throughout the shift to clean the plant and to fill-

in at the machines.  Although it is clear that the all of the members of the D-shift were not happy

about the transfer, exactly which employee took which action that night remains unknown.

According to the Plaintiffs, following the transfer announcement, Cleveland stated that

she would not be performing any work that evening.  Harris, apparently, acquiesced in this plan

and remained at a picnic table with Cleveland for the majority of the evening.   (Doege Dep. at

39).   Nevertheless, the Plaintiffs (Doege and Cotner) claim that they did everything in their

---

[1]Lyle Sayers was initially a plaintiff in this action, but stipulated to a dismissal of his
claims with prejudice which was approved by Court order on June 6, 2005. [Doc. 63].

power to get the other members of their shift to perform work.   (Cotner Dep. at 25).  The

Plaintiffs claim that they helped produce 26 mattresses, pushed molds, got wax and markers

necessary to perform the production work, cleaned up the work area, and pulled plugs on the

manufacturing machine. (Doege Dep. at 57; Cotner Dep. at 56).  However, they contend that

they could not manufacture mattresses without all of the members of the shift participating.  (Plf.

Resp. at 7).  Apparently, they were occasionally successful in their attempts to get the others to

work because the D-shift ultimately produced 26 mattresses that evening.

      In contrast, Sealy maintains that all of the members of the D-shift performed virtually no

work over the course of the evening.  Indeed, even the Plaintiffs testified that they "pretty much

stood there most of the night," (Doege Dep. at 46), and that "no work was performed between

10:00 p.m. and 12:30 a.m."  (Cotner Dep. at 35).   Sealy also contends that only four individuals

were needed to work the production line and Cotner's own testimony supports this contention.

(Cotner Dep. at 10-12) .  Thus, Sealy argues that the Plaintiffs could have performed work if

they wanted to.  (Def. Resp. at 7).

      Regardless, the parties do not dispute that at approximately 2:10 a.m., the supervisor,

Dock,  pulled the production report and noticed that the numbers were low.  Dock went to

Cleveland to make sure that the count was correct and that the machines were operable.  She

confirmed that they were.  Dock then ordered the members of D-shift to punch out and go home.

At no time during the alleged slow-down did either of the Plaintiffs approach Dock to advise him

what was going on or to request his assistance in getting the others off their duffs.   The first

Dock learned of the slowdown was when he looked at the production numbers.

      The next morning, June 26, 2003, Dock reported the D-shift incident to Paul Ladd,

Sealy's Human Resources Administrator.  Ladd interviewed Cleveland, Harris, and Soloman and the Plaintiffs, Doege and Cotner, later that morning.  (Ladd Dec. at ¶¶ 5-9).  He took notes of each of his interviews.  (Def. Ex. B at Exs. 1-5).  According to Ladd's notes, substantial finger-pointing took place during the interviews with each member of D-shift claiming that different members of the shift were unwilling to work.  For example, Cotner stated that she, Sayers and Soloman were willing to work, but indicated that Cleveland was not and that Harris and Doege asked to go home.  (*Id*. at Ex. 1).  On the other hand, Doege stated that Cleveland and Harris didn't want to work.  (*Id*. at Ex. 5).  Cleveland stated that Soloman, Cotner, and Doege were the ones not working.  (*Id.* at Ex. 3).

Ladd also reviewed written statements that were taken by the Union.  He found the statements to be consistent with his own findings.  That is, each of the members of D-shift confirmed that a work slowdown had taken place but no individual admitted their own participation in the slowdown.  Instead, they all pointed fingers at the others.  (*Id*. at ¶10).  Based on his interviews with the members of D-shift, his review of the Union statements and discussions with the Union, Ladd determined that the Plaintiffs (and the others) had all violated Article 12-1 of the CBA by engaging in a work slowdown.  Article 12-1 provides that the grievance procedure is the only remedy for settling violations of the agreement and that "**neither the Union nor the employees will instigate, promote, sponsor, engage in or condone any** strike, sympathy strike, **slowdown**, concerted stoppage of work or any other intentional interruption of production regardless of the reason." (See Def. Ex. C at Dep. Ex. 2, p. 30) (emphasis added).  Because Sealy and the Union concluded that Article 12 had been violated, all involved in the work slowdown, including the two Plaintiffs, were terminated. (Ladd Dec. at ¶

12).

Following their termination, the Plaintiffs took steps to begin the grievance process as set forth in the CBA.   Doege contacted Mike Weems, a Union steward, and told him that she wanted to file a grievance.  Cotner also filed a grievance with the Union.

The Union conducted its own investigation into the events of June 25, 2003 and concluded that pursuing the grievances and going to arbitration was unwise.  On September 22, 2003, Peter Mitchell, Assistant General Counsel to the IUE/CWA, wrote to Rose Osborn, the Secretary-Treasurer of Local 84303 and summarized the Union's decision.  According to the letter, Mitchell concluded that a work slowdown had taken place at the Rensselaer plant. Mitchell arrived at this conclusion after spending "considerable time reviewing both the facts and the contract language . . ." (Def. Ex. B at Ex. 11).  Mitchell further opined:

> I concluded that there was no basis to process [the Plaintiffs'] grievances to arbitration.  Given the small amount of work time that was performed on the day in question and the statements of the individuals and the factual context in which the slowdown took place, I could discern no arguments to suggest that the union would prevail in arbitration.

(Def. Ex. B at Ex. 11).  The Union's decision to not proceed with the grievance procedure, as articulated by its attorney Mitchell, was based upon the evidence presented during the investigation and was consistent with the position taken by the local Union representative, Dennis Allen, who had earlier concluded that the plaintiff's cases "do not warrant processing to arbitration." *Id*.  This was because, in Mitchell's opinion, "An extreme slowdown . . . is considered by arbitrators as a most serious offense, similar to theft." *Id*.  Consequently, the Union decided to not proceed to arbitration.

Mr. Mitchell's conclusion that the slowdown could not be the subject of a grievance

derived from Article 11 of the agreement. That section sets forth the grievance procedure negotiated between the Union and Sealy. It provides four specific steps through which an employee may grieve any dispute with Sealy. However, Section 11-3 specifically exempts violations of Article 12 from the grievance process. It provides:

> For the purposes of this Agreement, a grievance is any dispute or difference of opinion between the Company and the Union or between the Company and any of its employees covered by this Agreement involving the meaning, interpretation or application of the provisions of this Agreement provided, however, that **this Article shall not be applicable with respect to alleged violation of Article 12 of this Agreement**.

(See Def. Ex. C at Dep. Ex. 2, p. 28) (emphasis added).

At oral argument, it became clear that the Plaintiffs do not challenge that a work slowdown occurred at the Sealy plant, but rather they challenge Sealy's determination that Cotner and Doege, as individuals, participated in the work slowdown. The letter from the Union does nothing to illustrate whether the Plaintiffs communicated this concern to the Union or whether the Union treated the Plaintiffs individually during the course of its own investigation. At bottom, the Court need not resolve what exactly the Union did to individually determine which employees were involved in the work slowdown because the Plaintiffs conceded that the Union did not breach its duty of fair representation both at oral argument and in their briefing. (Plf. Resp. at 11) ("It is undisputed that Section 1201 of the Agreement in this case is not subject to the grievance machinery in the Agreement. Therefore, it makes sense that Union would have no duty in these circumstances . . .).

-6-

## II.  DISCUSSION

### A.    Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  The Court must view all evidence in the light most favorable to the nonmoving

party and must draw all reasonable inferences in the nonmovant's favor.  *Germano v. Winnebago

County, Ill*, 403 F.3d 926, 927 (7th Cir. 2005).  The non-moving party must then set forth specific

facts showing there is a genuine issue of material fact and that the moving party is not entitled to

judgment as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).  A genuine

dispute about a material fact exists only if the evidence is such that a reasonable jury could

return a verdict for the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24

(1986).  In making this determination, the Court must draw every reasonable inference from the

record in the light most favorable to the non-moving party.  *Dyrek v. Garvey*, 334 F.3d 590, 598

(7th Cir. 2003).  However, the non-moving party must support its contentions with admissible

evidence and may not rest upon mere allegations in the pleadings or conclusory statements in

affidavits.  *Celotex*, 477 U.S. at 324.

### B.    Plaintiffs' Claims Present a Hybrid §  301 Claim

We must first decide the true nature of the Plaintiffs' claim against Sealy.  The Plaintiffs

originally brought their Complaint in Indiana State Court as a two-count complaint.  In Count I,

the Plaintiffs alleged that the Union breached its duty of fair representation.  In Count II, titled

"Wrongful Termination" they alleged that "Sealy's termination of the Plaintiffs' herein was

wrongful and illegal and constitutes both a breach of the Collective Bargaining Agreement and Wrongful Termination." (Cmpl. at ¶ 28).

Sealy removed this action to federal court arguing that the Plaintiffs' claims were truly a hybrid claim brought pursuant to Section 301 of the Labor Management Relations Act.   In their response to summary judgment, the Plaintiffs' contend that their claims against Sealy are not part of a hybrid claim, but rather are some other form of wrongful termination claim only against Sealy.  However, the Plaintiffs have not cited a single case creating some "wrongful termination" action outside of Section 301.   Indeed, all of the law they cite in response to summary judgment pertains to Section 301 hybrid claims.  Nor have the Plaintiffs articulated any other theory against Sealy.

Section 301 preempts state law claims that involve alleged breaches of a collective bargaining agreement.  *In re Bentz Metal Products Co. Inc.*, 253 F.3d 283, 286 (7th Cir. 2001). The reason for this is to avoid inconsistent interpretations of collective bargaining agreements. *Nelson v. Stewart*, 422 F.3d 463, 468 (7th Cir. 2005).  To allow state breach of contract actions for alleged violations of CBAs could frustrate the Congressional goal of providing an orderly and consistent handling of labor disputes. *Lingle v. Norge Div. Of Magic Chef, Inc.*, 486 U.S. 399, 404, n.3 (1988).   Thus, state common law claims of breach of contract that are substantially dependent on analysis of a collective bargaining agreement are preempted by Section 301 of the LMRA.  *Atchley v. Heritage Cable Vision* Associates, 101 F.3d 495, 498-99 (7th Cir. 1996).

Because the Plaintiffs specifically pled that Sealy breached the CBA as part of its wrongful termination claim, we can see no claim other than the Section 301 claim that is available to the Plaintiffs.

**C.     The Merits of the Plaintiffs' § 301 Claim**

With the initial question resolved, we turn to the merits of Sealy's motion. Sealy principally argues that the Plaintiffs cannot succeed in their claims against it as a matter of law because they cannot prove that the Union breached its duty of fair representation.  We agree.

When an employer and a union are parties to a CBA that has procedures in it for resolving employment disputes, in order to maintain an actionable Section 301 claim against the employer, an employee must establish that the union breached its duty of fair representation. *Filippo v. Northern Ind. Pub. Serv. Corp.*, 141 F.3d 744, 748 (7th Cir. 1998) (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163-64 (1983)).  Such a suit is thus not a straightforward breach of contract claim, but instead is referred to as a hybrid Section 301/fair representation claim.  *DelCostello*, 462 U.S. at 162.

Under Section 301, the Plaintiffs are not required to sue both Sealy and the Union. However, to succeed in their Section 301 suit, the Plaintiffs must show **both** that Sealy breached its collective bargaining agreement **and** that the Union breached its duty of fair representation. *Neal v. Newspaper Holdings,* 349 F.3d 363, 369 (7th Cir. 2003).  These claims are interlocked with one another;  neither claim is viable if the other fails.  *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997); *Cote v. Eagle Stores, Inc.*, 688 F.2d 32, 35 (7th Cir. 1982).  An election to sue one or the other does not alter this standard.   *DelCostello*, 462 U.S. at 165 ("The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both.").

In this case, as mentioned above, the Plaintiffs essentially concede that the Union did not breach it duty of fair representation.  This, alone, is a death knell to the Plaintiffs' case.

However, even if the Plaintiffs' statements in writing and at oral argument are not construed as conceding this argument, Sealy has presented convincing evidence that the Union did not breach its duty of fair representation. In response, Plaintiffs have presented no evidence to the contrary.

A union breaches its duty of fair representation only if its actions are arbitrary, discriminatory or in bad faith. *Neal*, 349 F.3d at 368. Here, Sealy presented ample evidence that the Union's actions were not. Sealy's chief evidence is a letter from Peter Mitchell, the Union's Assistant General Counsel, detailing how the Union came to the conclusion to not pursue the Plaintiffs' grievances. First, according to the letter, Dennis Allen, the Union's local representative in Renssalaer, determined that the cases were not worth processing to arbitration because there was substantial evidence that a slowdown had taken place on the night in question. (Def't Ex. 11). Second, Mitchell came to the same conclusion after "spending considerable time reviewing both the facts and the contract language . . ." *Id*. Mitchell took into consideration the small amount of work that had actually been done that night, the statements that were taken from the various participants and the factual context in which the slowdown took place. *Id*. Based on all of this, Mitchell came to the conclusion that pursuing arbitration claims for the terminated employees would be fruitless because most arbitrators consider a work slowdown as a very serious offense and thus the likelihood of success was minimal. *Id.*

With this evidence, Sealy met its burden of showing why it was entitled to summary judgment on the Section 301 hybrid claim. In response, the Plaintiff's have presented no evidence to the contrary nor have they even argued that the Union breached its duty of fair representation. "It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *United States v.*

*Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (citing *Beard v. Whitley County REMC*, 840 F.2d 405,

408-09 (7th Cir.1988)). A party's failure to develop an argument constitutes a waiver of that

argument. *Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005) ("The failure to develop

an argument constitutes a waiver."). Accordingly, any argument that the Plaintiffs' might make

with respect the Union's investigation has been waived. *See Hart v. Transit Management of*

*Racine*, __ F.3d __, 2005 WL 2559706 (7th Cir. Aug. 17, 2005).

Instead of focusing their attention on the Section 301 hybrid claim, Plaintiffs invoke

*Clayton v. Internat'l Union, United Auto., Aerospace, & Ag. Implement Workers of America*, 451

U.S. 679 (1981) and *Groves v. Ring Screw Works*, 498 U.S. 168 (1990), to argue that they can

maintain an action against Sealy despite conceding that they have no action against the Union.

These cases do not help the Plaintiffs because neither decision changes the fact that in order to

maintain an action under Section 301, the Plaintiffs must prove both a breach of the duty of fair

representation by the Union and a breach of the Agreement by Sealy.

In *Clayton*, the Supreme Court addressed whether an employee seeking to sue his union

and employer under Section 301 "must also attempt to exhaust the internal union appeals

procedures established by his union's constitution before he may maintain his suit." *Clayton* 451

U.S. at 681. In holding that exhaustion of internal grievance procedures was not necessary, the

Supreme Court, in fact, reiterated what it said many times before – that the plaintiff must prevail

on both his claims against the union and the employer to obtain relief under Section 301. *Id*. at

693 (noting that exhaustion would not result in any judicial economy because "regardless of the

outcome of the internal appeal, the employee would be required to prove *de novo* in his § 301

suit that the union breached its duty of fair representation and that the employer breached the

collective-bargaining agreement.").

*Groves* is equally inapposite. In that case, the Supreme Court addressed whether a union's decision not to strike at the end of an unsuccessful grievance process would bar an action under Section 301. *Groves*, 498 U.S. at 171. The Court considered a provision in the collective bargaining agreement that specifically allowed a union to strike if it could not reach acceptable compromise during the grievance process. When the plaintiffs' union was not able to resolve the dispute in the grievance process, but elected not to strike, the employer argued that the union's election not to strike precluded a Section 301 claim. The Supreme Court ultimately held that it did not. This decision simply has no bearing on this case because the Court did not alter the well-settled principal that a Section 301 plaintiff must prevail against its union in order to prevail against the employer.

The final case cited by Plaintiffs, *International Brotherhood Of Elec. Workers v. Hechler*, 481 U.S. 851 (1987) actually undermines Plaintiffs' argument. In *Hechler*, the Court held that even a state *tort* claim can be preempted if such an action requires interpretation of the CBA. If it does, then even these claims are characterized as Section 301 claims.

Simply stated, the Plaintiffs have not articulated any claim against Sealy other than a classic Section 301 hybrid. They brought their claim in a hybrid posture by initially suing both the Union and Sealy. They continued their claim in this posture, even after dismissing the Union, by characterizing their claim as a breach of the collective bargaining agreement. The Plaintiffs have never provided the court with any other legal basis for their claim.

As a claim for breach of the collective bargaining agreement, the Plaintiffs must prove both that the Union breached its duty of fair representation and that Sealy breached the collective

bargaining agreement. *DelCostello*, 462 U.S. at 162. By conceding that they have no claim against the Union, the Plaintiffs have argued themselves out of Court. Without a viable claim against the Union, the Plaintiffs have no claim against Sealy.

### III.  CONCLUSION

It is clear that the Plaintiffs' claim against Sealy is a hybrid Section 301 claim pursuant to the LMRA which would require proof of both the Union's violation of its duty of fair representation and Sealy's breach of the collective bargaining agreement, in order to afford the Plaintiffs any relief. Because the Plaintiffs have no viable claim against the Union, their claim against Sealy likewise fails. Sealy's motion for summary judgment [Doc. 48] is, therefore, GRANTED.

**SO ORDERED.**

ENTERED: October 26, 2005

 s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT